IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

J.O.,

Plaintiff,

v. No. 1:23-cv-01021-KG-JMR

BOARD OF EDUCATION OF ALBUQUERQUE PUBLIC SCHOOLS and DANNY ALDAZ,

Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Albuquerque Public Schools' ("APS") Motion to Exclude or Limit Testimony under Federal Rule of Evidence 702. The motion is fully briefed. *See* Docs. 236, 268, 307. For the reasons below, the motion is granted in part and denied in part.

## *I. Background*

The Court articulated the background of this case in its prior Order, Doc. 231, and does not repeat it here. Plaintiff retained Martin H. Teicher, MD, Ph.D. ("Dr. Teicher") to offer opinions concerning the "psychological impact of Plaintiff's alleged abuse." Doc. 236 at 2. Dr. Teicher is a "research psychiatrist at McLean Hospital and Associate Professor of Psychiatry at Harvard Medical School." *Id.* Dr. Teicher's report offers opinions concerning, among other subjects, Plaintiff's psychiatric conditions, educational experience, future health and vocational outcomes, and neuroimaging and brain development. *See generally id.* at 2–9. APS requests that the Court exclude or limit portions of Dr. Teicher's testimony under Federal Rules of Evidence 702 and 403. *See generally* Doc. 236.

## *II. Analysis*

APS's motion is granted in part and denied in part. Federal Rule of Evidence 702 governs the admissibility of expert testimony. A witness must first be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent must then demonstrate that it is more likely than not that (1) the expert's specialized knowledge will help the trier of fact, (2) the testimony is based on sufficient facts or data, (3) it is the product of reliable principles and methods, and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.*

In performing its gatekeeping role, the Court must ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). That obligation extends to all expert testimony, including testimony based on experience or other specialized knowledge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Because the reliability inquiry is flexible, the considerations identified in *Daubert* do not necessarily apply in every case. *Id.* at 150–52. The proponent bears the burden of establishing admissibility. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

When evaluating scientific testimony, courts may consider testing, peer review and publication, error rates and standards, and general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593–94. Those considerations are neither exhaustive nor dispositive; their relevance depends on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.*, 526 U.S. at 150. Although the Court's gatekeeping inquiry focuses on the reliability of an expert's methodology rather than deciding between competing conclusions, it need not admit an opinion where "there is simply too great an analytical gap

between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**A. Dr. Teicher's Educational Opinions**

First, APS challenges Dr. Teicher's opinions concerning the effect of the alleged abuse on Plaintiff's education. *See* Doc. 236 at 11–13. Dr. Teicher states that Plaintiff "failed to receive a customary second-grade educational experience" because she was "excused from assignments and given unmerited high grades," causing her to enter third grade "markedly behind her classmates in academic skills." *Id.* at 11. He also states that Plaintiff's education was "derailed to a substantial degree" during second grade and that the news of Aldaz's arrest later caused psychiatric symptoms that interfered with her ability to attend school and receive an education. *Id.* APS argues that these opinions exceed Dr. Teicher's expertise in psychiatry, and, as to Plaintiff's second-grade academic performance, rest on unsupported factual assumptions. *Id.* at 11–13.

Plaintiff responds that APS misconstrues Dr. Teicher's opinion. *See* Doc. 268 at 6–8. In Plaintiff's view, Dr. Teicher is qualified to explain the psychological and neurobiological effects of experiencing sexual abuse in the classroom, including the "defensive dissociation" that he concluded Plaintiff developed in response to the alleged abuse. *Id.* at 7. Plaintiff also asserts that her receipt of unmerited grades, excusal from assignments, and other classroom privileges are undisputed facts. *Id.* APS disputes that characterization and maintains that Dr. Teicher lacks any basis to determine whether Plaintiff's grades were unmerited or whether she entered third grade academically behind her peers. *See* Doc. 307 at 13–14.

The Court agrees with APS in part. An expert must possess skill, experience, or knowledge in the "particular field" in which he seeks to opine, or the subject of the proposed testimony must fall "within the reasonable confines" of his expertise. *Conroy v. Vilsack*, 707

F.3d 1163, 1169 (10th Cir. 2013); *see also Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001). Dr. Teicher expressly acknowledged that he is not an expert in primary or secondary education. *See* Doc. 307-1 at 25, 33–34. And Plaintiff has not shown that assessing whether a second-grade education was adequate, whether particular grades were merited, or whether Plaintiff entered third grade academically behind her classmates falls within the reasonable confines of Dr. Teicher's psychiatric expertise. Indeed, he agreed that he was not proposing to provide an expert opinion as to whether Plaintiff "entered the third grade substantially behind her peers." *Id.* at 34. Accordingly, Plaintiff has not carried her burden to establish that Dr. Teicher is qualified under Rule 702 to offer those education-specific opinions.

Even apart from Dr. Teicher's qualifications, those opinions lack a sufficient factual foundation. An expert's opinion must rest on facts that permit a "reasonably accurate conclusion as opposed to conjecture or speculation." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995). Dr. Teicher did not review Plaintiff's second-grade academic records or the records of her peers, and he conceded that his statements that Plaintiff received "unmerited high grades" and entered third grade behind her classmates were, "at the moment," "unverified." Doc. 307-1 at 26; *see also id.* at 33–34. When asked whether the information concerning Plaintiff's grades and relative academic performance was speculative as it stood, Dr. Teicher answered, "Yes. At the moment, it's unverified." *Id.* at 26. Rule 702 does not permit Dr. Teicher to supply either the educational expertise or factual foundation necessary for those conclusions.

This limitation does not, however, preclude Dr. Teicher from testifying within his psychiatric expertise about the effects of trauma and psychiatric symptoms on Plaintiff's ability to learn or attend school. Dr. Teicher explained that, as a psychiatrist, he could opine that

experiencing traumatic events in a classroom may interfere with a child's ability to learn. *Id.* at 34. That is materially different from evaluating the adequacy of Plaintiff's education or comparing her academic achievement with that of other students. Likewise, his opinion that psychiatric symptoms following Aldaz's arrest interfered with Plaintiff's school attendance concerns the effects of those symptoms, not the adequacy of her education. *See id.* APS may challenge the factual basis for those opinions, including their reliance on Plaintiff's self-report, through cross examination. *See Daubert*, 509 U.S. at 596.

Accordingly, Dr. Teicher may not testify, as an expert, that Plaintiff received unmerited grades, that her second-grade education was inadequate or inappropriate, or that she entered third grade academically behind her peers. Nor may he otherwise compare the quality of Plaintiff's education or academic performance to that of other students. He may, however, testify within his psychiatric expertise concerning the effects of trauma and psychiatric symptoms on Plaintiff's ability to learn, attend school, or participate in her education.

**B. Dr. Teicher's Future Health and Vocational Opinions**

APS next advances two related but distinct challenges to Dr. Teicher's opinions concerning Plaintiff's future health and vocational outcomes. First, APS argues that Dr. Teicher is unqualified to offer opinions concerning nonpsychiatric medical conditions, vocational training, or Plaintiff's occupational capabilities. *See* Doc. 236 at 13–15. Second, APS argues that several of Dr. Teicher's future-outcome opinions are unreliable and misleading because they extrapolate statistical risks observed in broader populations into predictions concerning Plaintiff. *See id.* at 27–29; Doc. 307 at 11–13. The Court addresses those arguments separately.

### 1. Nonpsychiatric and vocational opinions

Dr. Teicher opines that Plaintiff "may be at high risk for developing one or more major medical problems or health issues," including obesity, arthritis, high blood pressure, cancer, diabetes, heart disease, and autoimmune disorders. Doc. 307-2 at 9. He also opines that Plaintiff "may benefit from extensive vocational training," *id.*, and that her psychiatric conditions are associated with occupational impairment, disability, reduced work participation, and diminished life expectancy. *Id.* at 13–14. APS argues that those opinions extend beyond Dr. Teicher's expertise as a psychiatrist. *See* Doc. 236 at 13–15. In particular, APS relies on this Court's ruling in *Strickland v. City of Las Cruces*, 2025 WL 779551, at *4 (D.N.M.), where the Court limited a physician's testimony concerning future conditions and vocational consequences outside the physician's area of expertise. *See* Doc. 236 at 14–15.

Plaintiff responds that *Strickland* is distinguishable because Dr. Teicher "personally evaluated" Plaintiff and her records, and "specified the literature studies, and discrete medical history" of Plaintiff that supports his opinions. Doc. 268 at 8. Plaintiff emphasizes Dr. Teicher's expertise concerning the "neurobiological effects and consequences" of childhood sexual abuse and argues that his opinions therefore are neither speculative nor outside his field. *Id.*

The Court agrees with APS in part. As discussed above, general expertise in one field does not necessarily qualify an expert to opine on a related but distinct subject. *See Conroy*, 707 F.3d at 1169; *Ralston*, 275 F.3d at 969–70. *Strickland* is instructive. There, although the proposed expert was a physician, the Court limited his testimony concerning future tinnitus, arthritis, behavioral-health conditions, and employment consequences because he lacked expertise in the relevant specialties and his proposed predictions were not otherwise supported by that plaintiff's medical records. *Strickland*, 2025 WL 779551, at *4. The Court permitted the

physician to testify within his medical expertise, but not to assume the expertise of specialists whose fields lay outside it. *Id.*

The same distinction applies here. Dr. Teicher acknowledged that he is not an expert in the diagnosis or treatment of the nonpsychiatric conditions identified in his report. *See* Doc. 307-1 at 16. When asked whether he considered himself an expert in “obesity or medical conditions that are not psychiatric,” he explained that he was not an expert in the “diagnosis and treatment” of those conditions, but was familiar with literature concerning the medical consequences of childhood maltreatment. *Id.* at 16. He also explained that he has published on maltreatment as a risk factor for obesity. *Id.* at 17. Dr. Teicher’s familiarity with relevant literature may permit him, within the reasonable confines of his research expertise, to explain that studies have reported associations between childhood maltreatment and the subsequent physical-health outcomes. That familiarity does not qualify him, however, to diagnose those conditions, recommend their treatment, or offer an individualized medical opinion that Plaintiff herself is likely to develop obesity, cancer, diabetes, cardiovascular disease, or the other nonpsychiatric conditions identified in his report. Plaintiff has not shown that those individualized medical judgments fall within the reasonable confines of Dr. Teicher’s psychiatric expertise.

A similar limitation is applied to Dr. Teicher’s opinions on Plaintiff’s vocational ability. Dr. Teicher acknowledged during his deposition testimony that he is not an expert in vocational capability. *See* Doc. 307-1 at 31, 34–35. When asked whether he was making a vocational assessment of Plaintiff’s future ability to work, he responded: “I’m making a psychiatric determination; not a vocational determination.” *Id.* at 31. Accordingly, he may not testify as a vocational expert that Plaintiff requires extensive vocational training, that she is or is not capable

of certain types of employment, that she will be unable to maintain employment, or that her earning capacity will be reduced by a particular amount or to a particular degree. He may testify within his psychiatric expertise concerning the functional effects that psychiatric conditions can have on a person's ability to work.

**2. Statistical future-risk opinions**

APS separately challenges Dr. Teicher's opinions that Plaintiff faces an increased risk of future psychiatric treatment, hospitalization, disability, unemployment, accidental injury, reduced life expectancy, and other adverse outcomes. *See* Doc. 236 at 27–29; Doc. 307 at 12–13. APS emphasizes that Dr. Teicher repeatedly characterized those adverse outcomes as probabilities rather than certainties. When asked whether he could say with "any degree of certainty" that Plaintiff would require inpatient treatment, Dr. Teicher responded, "Right. It's a 'may.'" Doc. 307-1 at 30. He similarly testified that his opinions concerning future occupational impairment and reduced life expectancy reflected "probabilities," and that, statistically, Plaintiff was at an increased risk of those outcomes. *Id.* at 35. Plaintiff responds that Dr. Teicher's increased-risk opinions are supported by scientific literature concerning the long-term consequences of childhood maltreatment. *See* Doc. 268 at 7–8.

The Court disagrees that these opinions are inadmissible. Rule 702 does not require certainty, and medical prognosis frequently involves an assessment of future risk. *See Gomez*, 50 F.3d at 1519 (explaining that "absolute certainty is not required"). Dr. Teicher may explain within his psychiatric expertise that Plaintiff's diagnosed psychiatric conditions or particular symptoms are generally associated with other psychiatric consequences when that opinion is grounded in his evaluation of Plaintiff and identified research. But population-level associations do not, without more, establish that a particular outcome is likely to occur in Plaintiff. *See*

*Joiner*, 522 U.S. at 146 (recognizing that court may exclude opinion where "there is simply too great an analytical gap between the data and the opinion proffered"). Dr. Teicher's report, for example, discusses that individuals with ADHD "often fail to live up to their potential" and are "more likely than individuals without ADHD to be unemployed." Doc. 307-2 at 13. That study may inform Dr. Teicher's psychiatric prognosis, but it does not itself establish that Plaintiff will fail to live up to her full potential or be unemployed. Dr. Teicher acknowledged that he could not say whether those events would occur in Plaintiff's life. *See* Doc. 307-1 at 34–35.

Dr. Teicher may testify, within his psychiatric expertise and based on reliable literature, that psychiatric conditions or symptoms he has identified in Plaintiff are associated with increased risks and he may explain how those risks inform his psychiatric prognosis for her. He may not, however, impose population-level statistics onto an opinion that Plaintiff will, or is likely to, experience a particular adverse outcome unless he identifies a reliable basis for applying that outcome to Plaintiff individually.[1]

Accordingly, Dr. Teicher may testify to research concerning the general health consequences associated with childhood maltreatment to the extent that subject falls within his research expertise, but he may not present those associations as predictions of Plaintiff's future health. Likewise, he may testify within his psychiatric expertise concerning Plaintiff's psychiatric prognosis, but he may not testify that population-level outcomes will occur in Plaintiff absent a reliable individualized basis for that conclusion.

[1] This distinction also resolves APS's Rule 403 concern. Properly limited testimony regarding increased psychiatric risk and prognosis is probative of the potential effects of the conditions Dr. Teicher evaluated. The Court is unconvinced that its probative value, as limited above, is outweighed by its prejudicial effects. *See* Fed. R. Evid. 403.

### C. Dr. Teicher's neuroimaging opinions

APS next challenges Dr. Teicher's neuroimaging opinions on both qualification and reliability grounds. *See* Doc. 236 at 15–27; Doc. 307 at 2–11. Dr. Teicher used FreeSurfer software to derive measurements of the volume, thickness, and surface area of regions of Plaintiff's brain and compared those measurements to a reference group of approximately 122 healthy participants. *See* Doc. 307-2 at 4–6. Based on those comparisons and research concerning childhood maltreatment, Dr. Teicher concludes, among other things, that Plaintiff's alleged abuse "exerted a marked effect on her brain development" and that her altered developmental pattern is reflected in a 4.6-year difference between her chronological and estimated "brain age." *Id.* at 9–12. APS argues that Dr. Teicher is not qualified to render those opinions, and, alternatively, that his methodology does not reliably support conclusions concerning Plaintiff as an individual. *See* Doc. 236 at 16–27.

Plaintiff responds that APS conflates visual interpretation of an MRI with the quantitative neuroimaging analysis Dr. Teicher performed. *See* Doc. 268 at 8–11. Plaintiff emphasizes Dr. Teicher's decades of research concerning the effects of childhood adversity on brain development and notes that even APS's expert recognizes FreeSurfer as a "powerful research tool for neuroimaging analysis." *Id.* at 9. Plaintiff further points to Dr. Teicher's use of a reference group, statistical adjustments, and published studies concerning brain alterations associated with childhood maltreatment. *Id.* at 9–10.

First, the Court declines to categorically exclude Dr. Teicher's opinions on neuroimaging simply because he is not a neuroradiologist. Dr. Teicher expressly distinguished between visually interpreting an MRI for clinical purposes and analyzing quantitative data derived from MRI scans. He testified that he is "an expert on the effects of childhood adversity and other

factors on brain development" and has used MRI-derived measurements of regional brain volume and thickness in his research for decades. Doc. 307-1 at 4. Although he acknowledged he is not qualified to "visually inspect the MRI and come up with diagnoses," he explained that he can offer opinions from "the data derived from the scan." *Id.* at 4–5.

That distinction is significant. Rule 702 does not require Dr. Teicher to possess neuroradiology credentials to testify about a different subject that falls within the reasonable confines of his own expertise. *See Conroy*, 707 F.3d at 1169. Dr. Teicher's research expertise includes the analysis of MRI-derived measures as they relate to childhood adversity. Therefore, he may testify concerning research using MRI-derived measurements to study the effects of childhood adversity on brain development, including the quantitative methods used in that research. He may not, however, offer opinions reserved to a neuroradiologist, such as a clinical diagnosis based on visual interpretation of Plaintiff's MRI.

Next, the Court agrees with APS that Dr. Teicher did not reliably apply his research methodology to reach conclusions about Plaintiff individually, which is a requirement under Rule 702. *See* Fed. R. Evid. 702(d); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1212–13 (10th Cir. 2004) (affirming exclusion where scientific foundation did not reliably support expert's case-specific conclusion).

Dr. Teicher's published work examines associations between childhood maltreatment and brain structure across groups of subjects. Here, by contrast, he compared Plaintiff's individual measurements to a small reference group, identified measurements falling two or more standard deviations from the group mean as "abnormal." Doc. 307-2 at 4–12. Then he looked at group-based research concerning childhood maltreatment to attribute identified differences to Plaintiff's alleged abuse and to explain her individual psychiatric and cognitive symptoms. *See id.* His

deposition makes clear that he used those data to draw conclusions about Plaintiff individually: he testified that Plaintiff's brain is "different," "abnormal," and that the differences were "likely caused by the abuse" she experienced. Doc. 307-1 at 10.

First, Plaintiff has not shown that neuroimaging has been accepted as a scientifically valid method for determining that a particular person's brain differences were caused by childhood sexual abuse. Dr. Teicher acknowledged that neuroimaging is not used to diagnose sexual abuse and that professional organizations have *not* endorsed such an application. *See* Doc. 307-1 at 37–38. When asked about professional endorsement of this approach, he pointed to grant funding he has received to *study* the effects of childhood adversity using MRI and conceded that the subject continues to require study. *Id.* at 38.

Second, Dr. Teicher's application of this methodology to Plaintiff presents separate reliability concerns. His comparison group is a dataset developed in his own research program, and he did not replicate Plaintiff's results against a larger public dataset. *See* Doc. 307-1 at 32-33. Moreover, participants in the reference group were extensively screened for childhood maltreatment prior to evaluation, but that screening was not completed for Plaintiff. *Id.* at 40.

Rule 702 requires more than a reliable research technique in the abstract; the expert must reliably apply that methodology to the facts before the Court. *See* Fed. R. Evid. 702(d); *see Joiner*, 522 U.S. at 146 (permitting exclusion when "there is simply too great an analytical gap between the data and the opinion proffered"). Plaintiff has not shown that associations between childhood maltreatment and brain development have been validated as a method for determining that structural measurements in a particular person were caused by childhood sexual abuse or account for that person's particular psychiatric symptoms. *See Truck Ins. Exch.*, 360 F.3d at 1212–13.

Accordingly, Dr. Teicher may testify concerning general research on associations between childhood adversity and brain development, including the methods used in that research. He may not, however, use Plaintiff's FreeSurfer-derived measurements to draw any individualized conclusion about Plaintiff. Specifically, he may not testify that Plaintiff's brain is "different," "abnormal," altered, or injured because of the alleged abuse, or that any structural measurement was caused by or is consistent with that abuse. Nor may he testify that those measurements explain any psychiatric or cognitive symptom, establish a developmental or "brain age" difference, or otherwise provide objective, confirmatory, or corroborative evidence of the alleged abuse.

APS briefly argues that Dr. Teicher should not be able to use the neuroimaging evidence to corroborate Plaintiff's account of sexual abuse. *See* Doc. 307 at 10–11. Dr. Teicher testified that the imaging findings "lend credence to [Plaintiff's] claim of sexual abuse," Doc. 307-1 at 9, and later agreed that the imaging "corroborates" his other findings. *Id.* at 11.

While an expert may offer general and conditional testimony concerning characteristics that are consistent with sexual abuse, they may not vouch for a witness's credibility. *See United States v. Charley*, 189 F.3d 1251, 1264 (10th Cir. 1999). Here, that means Dr. Teicher may not directly tell the jury that his scientific analysis "lends credence" to Plaintiff's allegations or otherwise use his expertise to bolster Plaintiff's credibility.

Accordingly, APS's motion is granted as to Dr. Teicher's individualized neuroimaging opinions and denied to the extent APS contends that Dr. Teicher is categorically unqualified to testify concerning neuroimaging research within his field.[2]

---

[2] Because the Court excludes the individualized neuroimaging opinions under Rule 702, it need not analyze the same argument under Rule 403. To the extent APS seeks exclusion under Rule 403 of Dr. Teicher's properly limited testimony concerning neuroimaging research within

**D. Dr. Teicher's Clinical Causation Opinions**

Finally, APS argues that Dr. Teicher's clinical causation opinions are unreliable because he failed to adequately account for alternative causes of Plaintiff's psychiatric symptoms and low verbal IQ. *See* Doc. 236 at 29–31; Doc. 307 at 14–15. It is well established that an expert need not eliminate every possible cause. *See Taber v. Allied Waste Sys., Inc.*, 642 F. Appx. 801, 811 (10th Cir. 2016). But where an alternative cause is obvious and supported by the evidence, a causation expert employing differential reasoning must adequately account for it. *Id.*; *see Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237–38 (10th Cir. 2005). Once the most obvious causes have been considered and ruled out, however, remaining possible causes affect "the accuracy of the conclusion, not the soundness of the methodology," and therefore go to weight rather than admissibility. *Taber*, 642 F. Appx. at 811.

Here, the record does not support the wholesale exclusion of Dr. Teicher's psychiatric causation opinions. Dr. Teicher acknowledged that psychiatric disorders may have genetic or other causes, but explained that he considered Plaintiff's family history and did not identify a strong familial history of the disorders at issue. *See* Doc. 307-1 at 26. He also did not simply attribute every condition to the alleged abuse: he expressly recognized that Plaintiff's ADHD had predated second grade and did not attribute its onset to her alleged abuse at the hands of Aldaz. *Id.*; *see also* Doc. 307-2 at 7. His opinions concerning other psychiatric disorders also rest on his clinical evaluation of Plaintiff in combination with relevant literature. *See* Doc. 307-1 at 26; Doc. 307-2 at 7.

Plaintiff has not, however, shown a reliable basis for attributing her present verbal-IQ

---

his field, the Court is not persuaded that its probative value is substantially outweighed by the dangers identified in Rule 403.

score to the alleged abuse. *See* Doc. 307-2 at 12. Dr. Teicher acknowledged that genetics and other factors may contribute to IQ, and he had no baseline measurement showing that Plaintiff's verbal IQ declined following second grade. *See* Doc. 236 at 30; Doc. 307-1 at 34. Moreover, the stated bases for that opinion include the effects of the alleged abuse on Plaintiff's brain development and education, subjects which the Court has now limited. *See* Doc. 307-2 at 12.

Accordingly, APS's motion is denied as to Dr. Teicher's remaining psychiatric causation opinions, subject to the limitations already imposed in this Order, but granted to the extent Dr. Teicher proposes to testify that the alleged abuse caused or contributed to Plaintiff's low verbal IQ.

## ***III. Conclusion***

For the reasons above, the Court grants in part and denies in part APS's Motion to Exclude or Limit Testimony under Federal Rule of Evidence 702, Doc. 236. First, the motion is granted as to Dr. Teicher's education-specific opinions concerning the adequacy of Plaintiff's education, the merit of her grades, and her academic standing relative to other students. Dr. Teicher may testify about how trauma and psychiatric symptoms affected Plaintiff's ability to learn or attend school. He may not opine on the quality of her education or compare her academic performance to that of other students.

Second, the motion is granted as to individualized nonpsychiatric medical and vocational opinions but otherwise denied subject to the limitations above. Dr. Teicher may discuss general research concerning associations between childhood maltreatment and physical-health outcomes and the functional effects of psychiatric conditions on work. He may not predict that Plaintiff will develop a nonpsychiatric medical condition or offer vocational opinions about her training, employment capabilities, or earning capacity.

Third, the motion is denied as to statistical future-risk opinions, subject to the limitations on individualized predictions from population-level data. Dr. Teicher may explain increased risks associated with psychiatric conditions or symptoms he identified in Plaintiff and how those risks inform his psychiatric prognosis. He may not offer testimony predicting a particular outcome for Plaintiff applying population-level statistics alone.

Fourth, the motion is granted as to individualized neuroimaging opinions and denied as to general neuroimaging research within Dr. Teicher's expertise. Dr. Teicher may testify about general research using MRI-derived measurements. He may not use Plaintiff's FreeSurfer-derived measurements to draw case-specific conclusions about the alleged abuse, brain injury or alteration, psychiatric or cognitive symptoms, "brain age," or corroboration of Plaintiff's allegations. He also may not offer a clinical diagnosis based on visual interpretation of Plaintiff's MRI.

Fifth, the motion is granted as to the opinion that the alleged abuse caused or contributed to Plaintiff's low verbal IQ but otherwise denied as to Dr. Teicher's remaining psychiatric causation opinions. Dr. Teicher may offer his remaining psychiatric causation opinions. He may not testify that the alleged abuse caused or contributed to Plaintiff's low verbal IQ.

IT IS SO ORDERED.

/s/Kenneth J. Gonzales
CHIEF UNITED STATES DISTRICT JUDGE

- Please note that this document has been electronically filed. To verify its authenticity, please refer to the Digital File Stamp on the NEF (Notice of Electronic Filing) accompanying this document. Electronically filed documents can be found on the Court's PACER public access system.